UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-12327-GAO

BENJAMIN H. WHITTAKER III,
In his individual capacity and in his capacities as the
Administrator of the Estate of Benjamin H. Whittaker,
Deceased; the Administrator of the Estate of
Mary S. Whittaker, Deceased; Co-Successor Trustee
of the Benjamin H. Whittaker Trust u/a May 1, 1992;
and Co-Successor Trustee of the Mary S. Whittaker
Trust u/a May 1, 1992, and
JOAN MUMMERY,
In her individual capacity and in her capacities as the
Co-Successor Trustee of the Benjamin H. Whittaker Trust
u/a May 1, 1992; and Co-Successor Trustee of
the Mary S. Whittaker Trust u/a May 1, 1992,
Plaintiffs,

v.

SUSAN B. WHITTAKER,
Defendant.

ORDER
January 7, 2019

O'TOOLE, D.J.

The magistrate judge to whom this matter was referred filed a Report and Recommendation ("R&R") recommending that the Plaintiffs' Motion for Partial Summary Judgment (dkt. no. 73) be denied, and that the Defendant's Motion for Summary Judgment (dkt. no. 78) be granted. The plaintiffs timely filed an objection to the R&R, and the defendant filed an opposition to the objection. Having reviewed *de novo* the objected-to portions of the R&R, the plaintiffs' objections are overruled and the R&R is adopted for the reasons articulated by the magistrate judge.

Accordingly, the defendant's motion for summary judgment (dkt. no. 78) is GRANTED and the plaintiffs' motion for partial summary judgment (dkt. no. 73) is DENIED.

Judgment shall enter for the defendant.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BENJAMIN H. WHITTAKER III,
  In his individual capacity and in his capacities as the
  Administrator of the Estate of Benjamin H. Whittaker,
  Deceased; the Administrator of the Estate of
  Mary S. Whittaker, Deceased; Co-Successor Trustee
  of the Benjamin H. Whittaker Trust u/a May 1, 1992;
  and Co-Successor Trustee of the Mary S. Whittaker
  Trust u/a May 1, 1992,
JOAN MUMMERY,
  In her individual capacity and in her capacities as the
  Co-Successor Trustee of the Benjamin H. Whittaker Trust
  u/a May 1, 1992; and Co-Successor Trustee of
  the Mary S. Whittaker Trust u/a May 1, 1992,
      Plaintiffs,

v.                                                                         CIVIL ACTION NO. 15-12327-GAO

SUSAN B. WHITTAKER,
      Defendant.

REPORT AND RECOMMENDATION ON PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT (#73)
AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON
PLAINTIFFS' "COMPLAINT IN A CIVIL ACTION" (#78).

KELLEY, U.S.M.J

I. Introduction.

This is an action to void certain allegedly fraudulent monetary transfers. Plaintiff Benjamin H. Whittaker, III (Ben)[1] is the administrator of the estates of his deceased parents, Benjamin H. Whittaker (Benjamin) and Mary S. Whittaker (Mary). Ben and his sister, plaintiff Joan Mummery

---

[1] Since there are numerous members of the Whittaker family involved in this litigation, they will be identified by their first names.

1

(Joan), are co-successor trustees and beneficiaries of Benjamin and Mary's inter vivos trusts (the trusts). Defendant Susan B. Whittaker (Susan) is married to Ben and Joan's brother, James B. Whittaker (Jay). Jay was trustee of his parents' trusts before Ben and Joan succeeded him. This case arises out of allegedly fraudulent transfers of funds from Benjamin and Mary's trusts by Jay, when he was trustee, to Susan, his wife.

Plaintiffs moved for partial summary judgment (#73)[2] and defendant also filed a summary judgment motion (#78). The dispositive motions have been fully briefed (##74-75, 78-79, 82, 84-87, 96-97).

## II. Facts.

The facts set out below are undisputed except as indicated. On October 3, 2006, Jay became the trustee of his parents' trusts when his sister, Carol R. Bell (Carol), resigned from the position. (#82-1, Exh. C, D.) At the same time, Benjamin and Mary signed durable powers of attorney to Jay. (#77 ¶ 4.) Jay consolidated the trusts' portfolio from three brokerages into a single account at Fidelity Investments. (#77 ¶ 6.) In October 2006, the value of the Fidelity account was slightly over one million dollars. *Id*. Over a period of years, Jay departed from a previously successful investment strategy by changing the investments primarily to options; the account suffered devastating losses. (#77 ¶¶ 7-8.) By September 2011, the balance of the account had diminished to $29.21. (#77 ¶ 8.)

Benjamin died in January 2011, and Mary died in June 2012. (#77 ¶¶ 9, 10.) On the weekend of his mother's funeral services, Jay advised his siblings about the investment losses. (#77 ¶ 10; #78-2, Field Aff. ¶ 4, Tab 2 ¶¶ 59-60.) On about November 5, 2012, Jay stepped down

---

[2] The name of the motion is something of a misnomer, since plaintiffs seek the entry of judgment as a matter of law on the sole count in the complaint, *see* #76, proposed order.

as trustee; Ben and Joan became successor co-trustees of the trusts. (#77 ¶ 11; 78-2, Field Aff. ¶ 4, Tab 2 ¶ 74.)[3]

In June 2012, the statements for the Fidelity account for 2008 through 2011 were delivered to Joan through Jay's counsel. (#77 ¶ 12; #78-2, Field Aff. ¶ 4, Tab 2 ¶ 38.) Between June 2012 and June 21, 2013, plaintiffs sent lists to Jay questioning certain items from the Fidelity account. (#77 ¶ 13.) One such list or spread sheet, titled as Estate of Benjamin H. Whittaker, Fidelity Withdrawals/Checks – Unknown Payees, was sent from Ben's Ohio counsel[4] to Jay's Ohio counsel no later than June 21, 2013. *Id.* The spread sheet listed seven checks totaling $149,500.00 that were identified by check number, amount, and date clearing account. *Id.*; #78-1, Sontitch Aff. ¶ 3, Tab 3(ii), p. 2.

That same figure, $149,500.00, had been identified in plaintiffs' complaint filed against Jay in Ohio state court on February 15, 2013. (#77 ¶ 14.) In the Ohio complaint,[5] it was alleged that "the remaining $149,500 in withdrawals from the Fidelity accounts (sic) remains unaccounted for but, upon information and belief, were used by Jay and/or transferred to Defendants John Doe, Jane Doe and ABC Corp. for purposes that were not in keeping with the intentions of" Benjamin and Mary. *Id.*; #78-2, Field Aff. ¶ 4, Tab 2 ¶ 38. Under a section titled "Jay's Transfer of Assets," plaintiffs named Susan as engaging in actions with Jay to encumber their residence and protect it from attachment should Jay lose that lawsuit. (#78-2, Field Aff. ¶ 4, Tab 2 ¶¶ 63-67, 69-73.) During that litigation, on June 21 and July 24, 2013, plaintiffs were presented with financial records

---

[3] At about the same time, Ben was named as administrator of his parents' estates. (#77 ¶ 11.)

[4] Benjamin and Mary were residents of Ohio, as is Ben. *See* #78-2, Field Aff. ¶ 4, Tab 2 ¶¶ 1, 5.

[5] Claims for breach of fiduciary duty, fraud, negligent misrepresentation, exploitation, conversion, conspiracy and fraudulent transfers under the Uniform Fraudulent Transfer Act (UFTA), among others, were brought in the Ohio action. *See* #78-2, Field Aff. ¶ 4, Tab 2.

3

showing the transfers and investments made by Jay. (#78-1, Sontitch Aff. ¶ 3, Tab 3(ii), 3(iii), 3(v), 3(vi).) These documents included personal checks, deposit records to a TradeStation account and bank accounts, mortgage applications and an accounting of transfers from the trust fund account. *Id*. The checks were made out to either a TradeStation account or to Jay, and each was dated between April 27, 2009 and February 10, 2010. *Id*. Susan's name appeared as a joint owner of the TradeStation account, as well as a co-borrower on the mortgage loan application.[6] *Id*.

By letter dated June 24, 2013, after having received some of the TradeStation statements with defendant Susan Whittaker listed as co-owner, plaintiffs' Ohio attorney wrote to Jay's Ohio lawyer: "A partially-redacted copy of the personal income tax would provide information as to Jay Whittaker's reports of his income and expenses, but with the deposit of his parents' assets into a joint account owned by Mr. and Mrs. Whittaker (Jay and Susan), Susan Whittaker's joint liability with her husband is an open question." (#78-1, Sontitch Aff. ¶ 3, Tab 3(iii).)

On September 5, 2013, Jay filed a Voluntary Petition for relief pursuant to Chapter 7 of Title 11 of the U.S. Code. (#78-2, Field Aff. ¶ 6, Tab 4 ¶ 1.) In plaintiffs' adversary proceeding in Jay's bankruptcy action, the same total figure from improper withdrawals, $149,500.00, was alleged in the complaint filed on January 21, 2014. (#77 ¶ 15; #78-2, Field Aff. ¶ 6, Tab 4 ¶ 46.) In their complaint objecting to dischargeability in Jay's bankruptcy, plaintiffs contended that Jay transferred the proceeds of the mortgage refinances he and Susan had made on their home in Wellesley, Massachusetts, to protect them from claims by plaintiffs "or otherwise benefit personally from the transfers by funding the down payment for the purchase of a timeshare in

---

[6] Copies of two of the checks produced on June 21, 2013, ##1011 and 1013, indicate total transfers in 2009 of $107,500.00 to Jay that were deposited in Rockland Trust. The mortgage loan applications produced on July 24, 2013, reflect as an asset as of May 30, 2012, a checking account at Rockland Trust, with the account number. (#78-1, Sontitch Aff. ¶ 3, Tab 3(ii) and 3(vi); #78-4 ¶¶ 14-15.) This amount, $107,500.00, is the same amount alleged to have been used to purchase the timeshare in Mexico. (#1 ¶ 32.)

Mexico." (#78-2, Field Aff. ¶ 6, Tab 4 ¶ 79.) They alleged that Susan knew that "the Parents' account at Fidelity had an asset value of less than $10,000" when she and Jay entered into the first mortgage agreement with Rockland Trust. *Id.* ¶ 77. The following specific allegation was advanced: "To the extent that the Defendant [Jay] commingled, misused, misappropriated, concealed, or otherwise diverted Trust Assets for his own benefit or *for the benefit of his spouse*, the Defendant did so knowingly and willfully and with the intent to shield his own assets." (#78-2, Field Aff. ¶ 6, Tab 4 ¶ 140.) (emphasis added.)

In the present action, plaintiffs allege that $107,500.00 of unauthorized trust transfers were used to purchase a timeshare in Mexico owned by Jay and defendant, and that the money has never been paid back to the trust. (#1 ¶¶ 30-32, 34.) Plaintiffs further allege that $48,000.00 was diverted from the trusts and transferred to a TradeStation account jointly owned by Jay and Susan. (#1 ¶¶ 36-37, 39.) These transferred funds were also never repaid to the trust. (#1 ¶ 38.) The total of the amount alleged to have been fraudulently transferred, providing for certain corrected calculations,[7] is the same as the amount alleged in the Ohio civil action and the bankruptcy adversary action. (#77 ¶ 16.)

### III. Summary Judgment Standard.

The purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*, 394 F.3d 40, 42 (1st Cir. 2005) (internal quotation and citation omitted). When considering a motion for summary judgment, "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

[7] *See* #77 at 5 n.3 explaining the undisputed calculations.

The moving party bears the initial burden of averring the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (citations omitted). Once the moving party asserts the absence of genuine issues of material fact, the non-movant must demonstrate the existence of a factual dispute with requisite sufficiency to proceed to trial. *Fontánez-Núñez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006). However, ". . . improbable inferences, conclusory allegations, or rank speculation . . ." cannot alone defeat summary judgment. *Ingram v. Brinks, Inc.*, 44 F.3d 222, 229 (1st Cir. 2005).

In determining whether summary judgment is proper, the record must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in the non-movant's favor. *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006).

> Where, as here, both parties have moved for summary judgment, the standard is the same. The court must rule on each party's motion on an individual and separate basis. *Bienkowski v. Ne. Univ.*, 285 F.3d 138, 140 (1st Cir. 2002). For each claim, summary judgment is warranted if the record, viewed in the light most favorable to the non-moving party, discloses no genuine issue of material fact. *Kunelius v. Town of Stow*, 588 F.3d 1, 8–9 (1st Cir. 2009).

*Hutchins v. McKay*, 285 F. Supp. 3d 420, 422 (D. Mass. 2018).

Upon a party's motion, Rule 56 requires the entry of summary judgment where a party fails to establish the existence of any one essential element on which that party will bear the final burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (further internal quotation marks omitted)).

IV. Discussion.

A. Defendant's Motion for Summary Judgment.

Defendant's dispositive motion shall be the starting point since it challenges the timeliness of this action. In their one-count complaint, plaintiffs allege violations of the Uniform Fraudulent Transfer Act, Massachusetts General Laws chapter 109A §§ 1-12. Two subsections of the Act are relevant here. The first is § 5, which provides:

> § 5. Fraudulent transfer or obligation where creditor's claim arose before or after transfer or obligation
>
> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> > (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.
>
> (b) In determining actual intent under paragraph (1) of subsection (a), consideration may be given, among other factors, to whether:
> (1) the transfer or obligation was to an insider;
> (2) the debtor retained possession or control of the property transferred after the transfer;
> (3) the transfer or obligation was disclosed or concealed;
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (5) the transfer was of substantially all the debtor's assets;
> (6) the debtor absconded;
> (7) the debtor removed or concealed assets;
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Mass. Gen. L. c. 109A, § 5.

The second relevant subsection is § 6, which provides:

§ 6. Fraudulent transfer or obligation where creditor's claim arose before transfer or obligation

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Mass. Gen. L. c. 109A, § 6. (#1 ¶¶ 54, 57, 62.)

Defendant argues that the claims advanced by plaintiffs are untimely under chapter 109A § 10, the limitations provision of the statute, which reads as follows:

A cause of action with respect to a fraudulent transfer or obligation under this chapter shall be extinguished unless action is brought:

(a) under paragraph (1) of subsection (a) of section five, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant;

(b) under paragraph (2) of subsection (a) of section five or subsection (a) of section six, within four years after the transfer was made or the obligation was incurred; or

(c) under subsection (b) of section six, within one year after the transfer was made or the obligation was incurred.

Mass. Gen. L. c. 109A, § 10.

Defendant characterizes this limitations provision as a pure statute of repose, while plaintiffs urge that the common law discovery rule should apply, based on a reading of the "could reasonably have been discovered" clause. Neither interpretation is fully accurate. This section of the statute acts as both a statute of repose *and* a statute of limitations. The Supreme Court has addressed this type of statutory structure:

> The pairing of a shorter statute of limitations and a longer statute of repose is a common feature of statutory time limits. *See*, *e.g.*, *Gabelli v. SEC,* 568 U.S. 442, 453, 133 S. Ct. 1216, 185 L.Ed.2d 297 (2013) ("[S]tatutes applying a discovery rule . . . often couple that rule with an absolute provision for repose"). The two periods work together: The discovery rule gives leeway to a plaintiff who has not yet learned of a violation, while the rule of repose protects the defendant from an interminable threat of liability. Cf. *Merck & Co. v. Reynolds,* 559 U.S. 633, 650, 130 S. Ct. 1784, 176 L.Ed.2d 582 (2010) (reasoning that 2–year discovery rule would not "subject defendants to liability for acts taken long ago," because the statute also included an "unqualified bar on actions instituted '5 years after such violation'").

*Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, - U.S. -, 137 S. Ct. 2042, 2049-50 (2017). Here, subsection (a) is a statute of limitations, as evidenced by the more flexible "could reasonably have been discovered" language typically incorporated in a common law discovery rule or a statute of limitations. Subsections (b) and (c) are both statutes of repose, and quash any right and remedy after a period of time, regardless of the plaintiffs' knowledge.

In this case, it is undisputed that the alleged fraudulent transfers took place between April, 2009 and July, 2010. (#78 ¶¶ 25-28; #78-1, Sontitch Aff. ¶ 3, Tab 3(ii).) The complaint here was filed in June 2015. (#1.) Given that this action was filed more than four years after the transfers were made, the four-year statute of repose in §§ 10(b) and (c) extinguishes all claims alleged except those under § 5(a)(1). The remaining inquiry under § 10(a) is whether the § 5(a)(1) claims in the complaint were filed "within one year after the transfer or obligation was or could reasonably have been discovered by the claimant."

The Massachusetts discovery rule, as limned by the First Circuit, is familiar:

> The discovery rule properly pertains only to those plaintiffs whose injuries are inherently unknowable. A plaintiff need not know the extent of the injury or know that the defendant was negligent for the cause of action to accrue. She simply must know that she sustained appreciable harm as a result of the defendant's conduct. In other words, the running of the statute of limitations is delayed while the facts, as distinguished from the legal theory for the cause of action, remain inherently unknowable to the injured party.

*RTR Techs., Inc. v. Helming*, 707 F.3d 84, 90 (1st Cir. 2013) (internal quotation marks, alterations and citations omitted); *AA & D Masonry, LLC v. S. St. Bus. Park*, - N.E.3d -, No. 16-P-1752, 2018 WL 3747899, at *4 (Mass. App. Ct. Aug. 8, 2018) ("The rule provides that a cause of action accrues for purposes of the statute of limitations on the happening of an event likely to put the plaintiff on notice of facts giving rise to the cause of action. Under the discovery rule, the limitation period accrues when the plaintiff has sufficient notice of two related facts: (1) that it was harmed; and (2) that the harm was caused by the defendant's conduct. The knowledge required to trigger commencement of the statute of limitations is not notice of every fact which must eventually be proved in support of the claim, but rather knowledge that an injury has occurred.") (internal quotation marks, alterations and citations omitted); *Commonwealth v. Tradition (N. Am.) Inc.*, 71 N.E.3d 142, 149–50 (Mass. App. Ct. 2017). Here, there is no doubt that plaintiffs knew they were harmed when Jay informed them in 2012 that the corpus of the trusts was decimated and Joan was provided with the Fidelity account statements. The pivotal question is when the plaintiffs had sufficient notice that the harm may have been caused, in part, by Susan.

Joan testified that she first became aware in September of 2014 that the TradeStation and timeshare transfers went into accounts and/or properties in which Susan had an interest. (#82 ¶ 10.) Ben claims that he first became aware that the TradeStation and timeshare transfers went into accounts and/or properties in which Susan had an interest after the depositions of Susan and Jay

on September 4, 2014. (#82 ¶ 11.) Even if one accepts that Joan and Ben had actual, personal knowledge on those dates, the law is clear that the plaintiffs are also bound by the knowledge of their attorneys. *See Link v. Wabash R. Co.*, 370 U.S. 626, 633–34 (1962) ("Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.") (internal quotation marks and citation omitted); *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396–97 (1993); *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 92 (1990); *Langadinos v. Bd. of Trustees of Univ. of Massachusetts*, No. CIV.A. 12-11159-GAO, 2013 WL 5507042, at *9 (D. Mass. Sept. 30, 2013) ("In any event, whether Langadinos heard Davis' testimony or not, he does not dispute that his attorney was at the deposition. Indeed, Langadinos' attorney was the one deposing Ms. Davis. As Langadino's agent, his counsel's knowledge is imputed to Langadinos. *See HDH Corp. v. LaFlamme*, 62 Mass. App. Ct. 1106 (2004) (table) (attorney's knowledge of contents of an answer imputed to client); *Quinn v. Hintlian*, 4 Mass. App. Ct. 805, 805, 346 N.E.2d 374 (1976). Thus, Langadinos was on notice of Ward's alleged statements [about which Davis testified] no later than May 7, 2006 [the date of Davis' deposition].")

The Fidelity records were turned over to Joan in June 2012. Plaintiffs filed suit against Jay in Ohio state court approximately eight months later, on February 15, 2013. Although Susan was not named as a defendant in that action, plaintiffs there alleged that the same sum later alleged in the adversary proceeding and the instant case was diverted from the trusts and "transferred to Defendant[] . . . Jane Doe." (#78-2, Field Aff. ¶ 4, Tab 2 ¶ 38.) Plaintiffs further alleged that Susan

11

took action to encumber her residence with a mortgage to protect it from claims. (#78-2, Field Aff. ¶ 4, Tab 2 ¶¶ 63-67, 69-73.) Prior to June 21, 2013, plaintiffs' Ohio counsel had identified seven suspect withdrawals/checks by Jay from the trusts. (#78-1, Sontitch Aff. ¶ 3, Tab 3(ii).) Six of those seven checks form the basis of the claims in this case. (#78 ¶ 32.) On June 21 and July 24, 2013, plaintiffs were given financial records from Jay that included personal checks, deposit records to a TradeStation account and bank accounts, mortgage applications and an accounting of transfers from the trust fund account. (#78-1, Sontitch Aff. ¶ 3, Tab 3(ii), 3(iii), 3(v), 3(vi).) Three days after receiving the documents, on June 24, 2013, plaintiffs' Ohio attorney wrote to Jay's attorney that *"with the deposit of his parents' assets into a joint account owned by Mr. and Mrs. Whittaker (Jay and Susan), Susan Whittaker's joint liability with her husband is an open question."* (#78-1, Sontitch Aff. ¶ 3, Tab 3(iii).) (emphasis added.)

Plaintiffs state as a fact that "[t]he checks relating to the TradeStation transactions do not indicate a deposit into a joint account." (#82 ¶ 14.) This statement is simply incorrect. First, it is undercut by plaintiffs' Ohio counsel's June 24, 2013 letter, quoted above. Moreover, a review of the documents sent to plaintiffs' Ohio counsel in June 2013, (#78-1, Sontitch Aff. ¶ 3, Tab 3(ii) at 15, 23), reveals, for example, that check #1020 from the account of Ben (Benjamin) H. Whittaker dated February 5, 2010 made out to TradeStation Securities for $13,000.00 with the memo notation of "deposit acct. #-----240" is reflected in the TradeStation account statement for James (Jay) B. Whittaker & Susan B. Whittaker JTWROS, account number -----240, for the period January 29, 2010 through February 25, 2010. In other words, one can see from examining the documents that plaintiffs' Ohio counsel had in his possession in June 2013 that the checks *were* deposited into a joint account, contrary to plaintiffs' assertions.

Two of the checks produced on June 21, 2013, ##1011 and 1013, reflect that they were made out to James Whittaker on the account of Ben (Benjamin) H. Whittaker, and that they were deposited into a Rockland account. (#78-1, Sontitch Aff. ¶ 3, Tab 3(ii) at 10, 12.) The joint mortgage loan application produced on June 24, 2013, reflects that Jay and Susan had an account at Rockland Trust. Plaintiffs' Ohio counsel was aware of this account: by letter dated July 19, 2013, counsel requested "documentation about the conveyance of assets to Rockland account(s)." (#78-1, Sontitch Aff. ¶ 3, Tab 3(iv) at 31, 52.)

It is thus clear that based on documents he received on June 21 and 24, 2013, plaintiffs' attorney had actual knowledge of deposits of trust assets into a joint account of Jay and Susan at TradeStation. Plaintiffs' attorney also knew that deposits of trust assets had been made into an account at Rockland Trust, and that a Rockland Trust account was listed on Jay and Susan's joint mortgage loan application. At this juncture, the facts underlying potential claims against Susan were not inherently unknowable.

In their adversary complaint filed on January 21, 2014, in Jay's bankruptcy proceedings, plaintiffs sought recovery on the same seven checks. It was alleged, as it had been in the Ohio litigation, that Jay transferred the proceeds of the mortgage refinances he and Susan had made on their home to protect those monies from claims by plaintiffs "or otherwise benefit personally from the transfers by funding the down payment for the purchase of a timeshare in Mexico." (#78-2, Field Aff. ¶ 6, Tab 4 ¶ 79.) Plaintiffs alleged that Jay had diverted trust assets "for the benefit of his spouse," (#78-2, Field Aff. ¶ 6, Tab 4 ¶ 140), and that "Jay and his spouse knowingly engaged in acts to hinder and delay their creditors, including the potential claims arising from the… management of the Trust Assets." (#78-2, Field Aff. ¶ 6, Tab 4 ¶ 171.) The two checks that had been deposited in the Rockland Trust account amounted to the same $107,500.00 alleged in the

13

instant complaint as having been used to pay for the timeshare in Mexico owned by Jay and Susan.(#1 ¶¶ 30-34.) In light of the allegations made in the bankruptcy proceeding, to the extent that plaintiffs' claims did not accrue on or before June 24, 2013, they clearly had accrued in January 2014. As the allegations in the adversary complaint make clear, by January 2014 plaintiffs knew "that [they] sustained appreciable harm as a result of the defendant's conduct." *RTR Techs., Inc.,* 707 F.3d at 90. Since suit was not brought until June 2015, over a year after plaintiffs' § 5(a)(1) claims accrued, those claims are outside the statute of limitations and should be dismissed.

B. Plaintiffs' Motion for Summary Judgment.

Having concluded that plaintiffs' claims are untimely, there is no need to address the merits of their dispositive motion.

V. Recommendation.

For the reasons stated, I RECOMMEND that the Motion of Defendant Susan B. Whittaker for Summary Judgment on Plaintiff's "Complaint is a Civil Action" (#78) be GRANTED. I FURTHER RECOMMEND that Plaintiffs' Motion for Partial Summary Judgment (#73) be DENIED.

VI. Review by the District Judge.

The parties are hereby advised that any party who objects to this recommendation must file specific written objections with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The objections must specifically identify the portion of the recommendation to which objections are made and state the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Federal Rules Civil Procedure, shall preclude further appellate review. *See Keating v. Secretary of Health & Human Servs.*, 848 F.2d 271 (1st Cir. 1988);

*United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

August 15, 2018

/s/ M. Page Kelley
M. Page Kelley
United States Magistrate Judge